## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARK PRICE,                          )
                                     )
         Plaintiff,                )
                                     )
   vs.                              )     Civil Action No. 3:22-cv-219
                                     )     Judge D. Brooks Smith
MELISSA HAINSWORTH and               )
TREVOR WINGARD,                      )
                                     )
         Defendants.               )

### MEMORANDUM and ORDER OF COURT

Plaintiff Mark Price, a former employee of the Pennsylvania Department of Corrections (the "DOC"), brought the above-captioned case against his former supervisors at Somerset State Correctional Institution ("SCI-Somerset"), Melissa Hainsworth and Trevor Wingard, asserting claims of hostile work environment (Counts I-III), disparate treatment (Counts IV-VI), and constructive discharge (Counts VII-IX). Defendants have moved for summary judgment on all counts. Because Price has shown a genuine dispute of material fact with respect to his claims of hostile work environment against Defendant Hainsworth and constructive discharge against both Defendants, I will deny summary judgment on those claims and grant summary judgment on the remainder.

1

## I.    Factual Background[1]

Price began working for the Pennsylvania Department of Corrections in 1994. ECF No. 43-1, at 4. In 2015, having achieved the rank of captain, Price was promoted to Major of Unit Management and transferred to SCI-Somerset. *Id.* at 9-10. As Major of Unit Management, Price was responsible for supervising and directing unit managers, who were, in turn, each responsible for a unit of the correctional facility. *Id.* at 6. While at SCI-Somerset, Price's immediate supervisor became Defendant Melissa Hainsworth, who, at the time, was serving as the Deputy Superintendent for Facilities Management. *Id.* at 9-10. Two levels above Price in the chain of command was Hainsworth's supervisor, then-Superintendent Trevor Wingard. *Id.* Price was the only Black man working in management at SCI-Somerset, *Id.* at 26; Hainsworth and Wingard are White. ECF No. 43-11, at 13.

Discord between Price and Hainsworth began soon after Price's arrival. Upon starting work, Hainsworth instructed Price's subordinates—unit managers and counselors—that they were to report directly to her. ECF No. 43-1, at 35. As Hainsworth allegedly explained to Price when they first met, she thought he should

---

[1] The following is a recitation of facts which also reflects the procedural posture of this case. On a motion for summary judgment, this Court resolves all factual doubts and draws all reasonable inferences in favor of the nonmoving party, here Price. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

not have gotten the position and that she would make sure he was replaced. *Id.* at 10, 12.

Nor did time resolve the divide between Price and Hainsworth. Price alleges numerous incidents of Hainsworth using racially charged language and slurs. In particular, Hainsworth regularly referred to Price as "shine," "shiny," and her "shiny major."[2] ECF No. 43-6, at 5-7; ECF No. 43-12, at 7. In one instance early in Price's tenure, Hainsworth referred to Price as "shiny major" while meeting with upper staff and unit managers. ECF No. 43-1, at 13. Price asked why she would refer to him using that term; in reply Hainsworth "smirked, and [] stroked her hand, referencing the skin color." *Id*. A White unit manager who attended these meetings also understood "shiny" to be a "racial derogatory term," and stated that Hainsworth's use of the term was "inappropriate." ECF No. 43-12, at 7-8.

In a similar incident that also occurring early in Price's tenure, Hainsworth was introducing SCI-Somerset personnel to a visiting outside agency. She introduced one subordinate by his name and provided his title—major—then

---

[2] The American Heritage Dictionary, published by HarperCollins, lists one definition of "shine" as "Offensive Slang [u]sed as a disparaging term for a [B]lack person." *Shine*, American Heritage Dictionary (2022) (https://ahdictionary.com/word/search.html?q=shine). Multiple witnesses, including Price, understood "shine" to be used in this manner. ECF No. 53-3, at 5; ECF No. 43-12, at 8-9; ECF No. 43-1, at 13.

introduced Price as "her shiny major." ECF 43-1, at 13. After this incident Price told
Hainsworth not to refer to him as "shiny," but Hainsworth persisted. *Id.*

Hainsworth's use of "shine," "shiny," and "shiny major" were not limited to
the above-described incidents. William Bowers, a unit manager at the time working
under Price, testified that Hainsworth would call Price "shiny all the time in
meetings, amongst other people," and in one-on-one conversations. ECF No. 43-12,
at 7.

Nor was Hainsworth's behavior limited to the use of "shine." In conversation
with Price, Hainsworth would refer to White inmates by their names, while referring
to Black inmates as "your people." ECF No. 43-1, at 17. Hainsworth told Price "your
people can't do the workload, your people can't do the job," which Price understood
as a reference to African Americans. *Id.* at 18. In the same vein, Hainsworth used
"those people" to refer to the then deputy secretary and secretary of the DOC, both
of whom were Black. *Id.* at 20. Price similarly told Hainsworth not to use this
language. *Id.* at 17-18. Still, her use of racial terms persisted. *Id.* at 17-18.

Hainsworth gave Price inconsistent orders. For example, Hainsworth
instructed Price to make more rounds of the institution; however, she later changed
course and complained that he was making rounds too often. *Id.* at 21. Hainsworth
frustrated Price's attempts to carry out his duties by preventing Price from notifying
certain of her favorite subordinates when they performed their jobs deficiently and

by instructing him not to investigate issues arising from unit inspections. *Id.* at 22-23.

In response to Hainsworth's behavior, Price paid a visit to SCI-Somerset's Human Resources officer. *Id.* at 18. After, hearing Price's complaints, the HR officer directed him to discuss the issue with Hainsworth's supervisor, Wingard. *Id.* Price followed that advice, and described Hainsworth's behavior to Wingard multiple times. *Id.* at 15, 18; ECF No. 53-5, at 4. After each discussion Price had with Wingard, Hainsworth responded angrily by going to Price's office to yell at him. *Id.* And Hainsworth's treatment of Price continued. ECF 43-1, at 15, 18.

Unit manager Bowers testified that Hainsworth treated Price differently than she did other staff at Price's seniority level. ECF No. 43-12, at 4-5. Specifically, when Price spoke, Hainsworth would commonly make nonverbal gestures (i.e., rolling her eyes or sighing) undercut what Price was saying. *Id.* at 8. In the event of a drill or emergency, senior staff would coordinate operations in the command center. Hainsworth, however, did not allow Price to work from the command center. *Id.* at 6; ECF No. 43-1, at 24-26.

During Price's tenure at SCI-Somerset, superintendent Wingard was promoted to regional deputy secretary, with deputy secretary Hainsworth being promoted to Wingard's former position of superintendent. ECF No. 43-12, at 9. According to

Bowers, Hainsworth's elevation to superintendent coincided with a precipitous drop in professionalism at the facility. *Id.*

Price's tenure at the DOC came to an end amidst tragic circumstances. In 2018, two inmates requested to speak with Price in his office. ECF No. 43-1, at 27. These inmates warned Price that one of SCI-Somerset's staff was going to be assaulted. *Id.* Price sought learn exactly who the planned target was, but was unsuccessful. *Id.*

Price testified that, immediately following this meeting, he called Wingard to inform him of the reported risk to staff. *Id.* Price claims that Wingard responded by asking him if he had told anyone else, *Id.*, and that when Price said no, Wingard replied: "If you tell anybody about this conversation, you and I will have a meeting at central office and you will not fare well." *Id.* at 28. At this point, Price believed he then had to choose between jeopardizing his career and the safety of SCI-Somerset staff. *Id.* In short, he felt forced to retire from his position at the DOC. *Id.* at 33. Shortly after Price's retirement, a sergeant at SCI-Somerset was beaten by inmates. *Id.* at 29. This attack led to the sergeant's death about two weeks later. ECF No. 43-11, at 13.

## II.    Procedural History

Price filed the above-captioned suit in November of 2022. His three claims—hostile work environment, disparate treatment, and constructive discharge—have

6

each been brought under three different statutes: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e) et seq., Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act of 1955 ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq. ECF No. 1.[3] After discovery, Defendants moved for summary judgment on all of Price's claims. ECF No. 41. Price has not moved for summary judgment.

### III.    Standard of Review

Summary judgment is appropriate where the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). When the movant is a defendant, that party must demonstrate that the plaintiff "has failed to establish one or more essential elements of his or her case." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

When considering a motion for summary judgment, "all evidence submitted must be viewed in a light most favorable to the party opposing the motion." *Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). However, "[t]he mere existence of a scintilla of evidence in support of the

---

[3] This court has subject matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

[non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.    Discussion

Price now maintains two claims: hostile work environment and constructive firing;[4] each based on the same three statutes: Title VII, PHRA, and Section 1981. I conclude that Price's claims are properly brought only under Section 1981.

As an initial matter, because Title VII does not allow suits against individuals, it cannot serve as the legal foundation for Price's claims. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077-78 (3d Cir. 1996) (en banc) (holding Title VII does not provide for liability against individual employees); *Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) (same).

The PHRA, unlike Title VII, extends liability for discrimination to individuals who "aid, abet, incite, compel or coerce" an employer's violation of the Statute. 43

---

[4] In his "Responsive concise Statement of Undisputed Material Facts," ECF No. 53, Plaintiff states that he "herewith is withdrawing his disparate treatment claim . . . and is proceeding only on his . . . hostile work environment/racial harassment claim and . . . constructive discharge claim . . . ." ECF No. 53, at 2. However, a plaintiff may only voluntarily dismiss a claim via "(i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or (ii) a stipulation of dismissal signed by all parties who have appeared." Fed. R. Civ. P. 41(a)(1)(A). Because neither of these conditions have been met, and Plaintiff has not presented argument responding to Defendants' motion for summary judgment on this issue, Plaintiff's claim for disparate treatment will be dismissed with prejudice.

Pa. Cons.Stat. Ann. 955(e); *Dici*, 91 F.3d at 552-53. However, Price has not alleged

any PHRA violation on the part of his employer. ECF No. 1. Courts in this Circuit

have held that an individual cannot be liable under PHRA Section 955(e) absent an

employer's violation of PHRA Section 955(a). *See Eldeeb v. AlliedBarton Sec. Servs.*

*L.L.C.*, No. 07-669, 2008 WL 4083540, at *11 (E.D. Pa. Aug. 28, 2008) ("Non-

employers, such as IMS, cannot violate PHRA Section 955(e) when there is no

corresponding Section 955(a) violation by an employer to aid and abet."), *aff'd*, 393

F. App'x 877 (3d Cir. 2010); *McIlmail v. Pennsylvania*, 381 F. Supp. 3d 393, 415

(E.D. Pa. 2019) ("Plaintiff's PHRA claim cannot survive without a requisite

"primary violation."); *Kaniuka v. Good Shepherd Home*, No. 05-cv-02917, 2006 WL

2380387, *10 (E.D.Pa. Aug.15, 2006). That limitation on liability under the PHRA

applies equally here, where Plaintiff has not claimed an underlying employer

violation of Section 955(a).[5] ECF No. 1.

---

[5] Price argues on summary judgment that he had no choice but to sue Hainsworth and Wingard as individuals rather than sue them alongside their employer, the DOC, because the department has immunity from suit. ECF No. 54 at 17-18. This is not the case for claims arising under Title VII. *See, e.g., Kissell v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 84, AFL-CIO, Council 13*, 90 F. App'x 620 (3d Cir. 2004) (affirming judgment against Pennsylvania Department of Corrections under Title VII). However, Plaintiff is correct that the DOC has immunity *in federal court* from claims under the PHRA. *See, e.g., Patterson v. PA Off. of Inspector Gen.*, 243 F. App'x 695, 696 (3d Cir. 2007) (holding that the Eleventh Amendment grated Pennsylvania's Office of Inspector General immunity to suit under the PHRA when brought in federal court); *Newton v. Pa. State Police*, No. 18-1639, 2020 WL 2572148, at *9 (W.D.Pa. May 21, 2020) (holding that the Commonwealth of Pennsylvania, along with its agencies, are immune from suits

Price's claims, however, may proceed under Section 1981. In *Cardenas v. Massey*, the Court of Appeals for the Third Circuit stated that "individual liability under [Section] 1981" may be found "when [the defendants] intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable." 269 F.3d 251, 268 (3d Cir. 2001) (internal quotations omitted). Defendants make no argument to the contrary. ECF No. 44.

So I turn to the merits of each of Price's two remaining claims. Upon review of the record, drawing all reasonable inferences in favor of Price, I will deny summary judgment as to Price's claim for hostile work environment against Hainsworth and his claims for constructive discharge against both Hainsworth and Wingard. I will grant Defendants' motion for summary judgment with respect to Price's claim for hostile work environment against Wingard. I analyze each claim below.

### a. Hostile Work Environment

To successfully make a claim for hostile work environment on the basis of race, a plaintiff must show: "1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would

---

under the PHRA when in federal court); *Sheldon v. Neal*, No. 11-1128, 2012 WL 4482026, at *2 (W.D. Pa. Aug. 28, 2012) (same), *report and recommendation adopted*, No. 11-1128, 2012 WL 4472003 (W.D. Pa. Sept. 26, 2012).

detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondent superior* liability." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).[6]

In analyzing a hostile work environment claim, a court is not to concentrate on "individual incidents." *Caver v. City of Trenton*, 420 F.3d 243, 262-63 (3d Cir. 2005). Rather, the Court is to look at the "overall scenario," focusing on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 263 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) (citation modified)).

To determine whether the discriminatory conduct was severe, "we look to whether the conduct creates 'an attitude of prejudice that injects hostility and abuse into the working environment.'" *Qin v. Vertex, Inc.*, 100 F.4th 458, 471 (3d Cir. 2024) (quoting *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020). I conclude that a reasonable jury, crediting Price and Price's witness' testimony, could find Hainsworth's conduct sufficiently severe or pervasive to support a claim of hostile work environment.[7]

---

[6] This final element, while met here, has limited relevance due to Price's choice not to bring suit against the DOC.

[7] Nearly all evidence in this case comes in the form of deposition testimony. Typically, "[t]o determine whether a nonmoving party's deposition testimony alone is insufficient to withstand summary judgment, the assertions must be compared to

While Price has made several serious allegations, Hainsworth's regular use of "shine," "shiny," and "my shiny major" to refer to Price, the only Black member of the facility's managerial staff, lies at the center of his claim. ECF No. 43-1, at 13; ECF No. 43-6, at 7; ECF No. 43-12, at 7. The jury could reasonably conclude that "shine" is both a racial epithet, ECF No. 54, at 10, and that it was used knowingly as such. As one witness recounted, "[calling someone shine is] inherently racial . . . [b]ecause to refer to a Black person as shine or shiny . . . conjures up images of a shoeshine boy." ECF No. 53-3, at 5; *see also* ECF No. 43-12 at 8-9 (Unit manager Bowers testimony that he understood "shine" to be a derogatory term). Even if Hainsworth was not initially aware that "shine" was a racial epithet, she was made aware repeatedly by Price and at least once by Bowers. ECF No. 43-1, 13 (Price);

---

the other evidence of record to determine whether they are 'sufficient for a rational factfinder to credit the plaintiff's testimony, despite its self-serving nature.'" *McBride v. Am. Substance Abuse Pros., Inc.*, 917 F. Supp. 2d 419, 426 (E.D. Pa. 2013) (quoting *Johnson v. MetLife Bank, N.A.*, 883 F.Supp.2d 542, 549 (E.D. Pa. 2012)). Here, Price's testimony has, in many instances, been corroborated by other witnesses. While several factual disputes arise solely from Price's own testimony, a jury may still be justified in crediting Price in those instances on the grounds that Price had been corroborated elsewhere.[7] *See Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 865 (3d Cir. 1986) (denying defendant's motion for summary judgment on plaintiff's claim of retaliation where plaintiff's testimony was "corroborated in part" by a witness's affidavit); *Mitchell v. Kensington Cmty. Corp. for Individual Dignity*, No. 18-28692019 WL 6353285, at *10 (E.D. Pa. Nov. 26, 2019) (denying defendant's motion for summary judgment on plaintiff's hostile work environment claim where plaintiff's testimony was "partially corroborate[d]" by a second witness).

ECF No. 43-12, at 8 (Bowers). Nonetheless, Hainsworth's behavior continued unabated. ECF No. 43-1, 13.

Hainsworth herself admits to calling Price "shiny major," though her own explanation for using the name is inconsistent. She testified that the moniker was given because "he was very well put together" and "[h]e liked anything that was shiny and that was gold." ECF No. 43-2, at 3. For his part, Bowers testified that Hainsworth told him that she called Price shiny because of his short attention span. ECF No. 43-12, at 7-8; see also ECF No. 43-6, at 6.

Hainsworth referred to Price as "shiny" when talking one-on-one with Price, ECF No. 43-1, at 13, when talking about Price with others, and when referring to Price in group settings. ECF No. 43-12, at 7. Though denied by Hainsworth, Bowers testified that "[Hainsworth] would call [Price] shiny all the time in meetings, amongst other people." *Id.*; *see also* 43-11, at 4 (Unit manager Eric Frazier testifying that he heard Hainsworth refer to Price as "shiny"). These seemingly racial usages by Hainsworth persisted throughout Price's more than two-year tenure at SCI-Somerset. *Cf. Qin*, 100 F.4th at 471 (3d Cir. 2024) ("[A] handful of isolated comments presented over [] nearly two decades . . . is not enough for a reasonable jury to conclude that [plaintiff] was subjected to a hostile work environment.").

Price testified that Hainsworth also would refer to Black people as "your people" and make racially disparaging comments such as "your people can't keep

up." ECF No. 43-1, at 16-17. Again, these comments continued even after Price confronted Hainsworth to explain that he understood her remarks to be referring to Black people. *Id.* at 17-18.

Testimony by unit manager Bowers supports the inference that Hainsworth's conduct materially altered the working environment. *See Castleberry*, 863 F.3d 259, 265 (3d Cir. 2017) (citing *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as the 'n-word' by a supervisor in the presence of his subordinates...." (citation modified))). According to unit manager William Bowers, Hainsworth elevation to superintendent coincided with a precipitous drop in professionalism at the facility. ECF No. 43-12, at 9. This fit in with what may have been a larger culture of racial hostility at SCI-Somerset. As testified to by Price, staff commonly addressed inmates using the n-word. ECF No. 43-1, at 28.

Multiple cases cited by Defendants actually undercut their position. For example, Defendants rely on *Williams v. Pennsylvania Hum. Rels. Comm'n*, which they contend dismissed a hostile work environment claim containing allegations more severe than those made by Price. No. 14-1290 2016 WL 6834612 (W.D. Pa. Nov. 21, 2016), *aff'd*, 870 F.3d 294 (3d Cir. 2017). However, the overt discriminatory actions in *Williams* were notably less severe and less pervasive than those testified

to here. The Plaintiff in *Williams*, a Black woman, alleged one instance of being referred to as a "bitch," and one instance of being referred to as an "aggressive female" and "troublemaker." *Id.* at *2-3. These two isolated instances were accompanied by a series of what the *Williams* Court described as "managerial functions or *de minimis* administrative decisions." *Id.* at *20. Similarly, Defendants point to *Troy v. State Correctional Institute – Pittsburgh*, in which plaintiffs' claims of hostile work environment—based upon plaintiff having had their office moved twice, been denied clerical assistance, condescended to by supervisors, given increased job duties, and refused needed training—were dismissed on the grounds that plaintiff's allegations amounted only to "ordinary tribulations of the workplace." No. 2:11-cv-1509, 2013 WL 5511265, at *9-11 (W.D. Pa. Oct. 4, 2013).

Far from the "managerial functions" and "ordinary tribulations of the workplace" described in *Williams* and *Troy*, Price's alleged treatment was unambiguously motivated by race. He was regularly referred to by racial epithets and faced direct derogatory remarks about his race over the course of more than two years. Such conduct is both severe and pervasive. *See Castleberry* 863 F.3d at 263-66 (finding plaintiff's allegations that supervisor used a racially charged slur in front of co-workers and threatened them with termination was sufficiently severe to state a claim for hostile work environment); *cf. Page v. City of Pittsburgh*, 114 F. App'x 52, 54 (3d Cir. 2004) (holding that plaintiff failed to make a hostile work

environment claim based on "a series of isolated incidents, all occurring in the month of October 1995."); *King v. City of Philadelphia*, 66 F. App'x 300, 305 (3d Cir. 2003) (holding that one instance of being called a racial epithet and pushed, combined with one instance of threatening to sabotage plaintiff's work record, were only "isolated and sporadic incidents.").

Hainsworth, supported by witness testimony, disputes nearly all of the above-recited facts. But disputes over such facts cannot be resolved by summary judgment. Their ultimate resolution resides solely with a finder of fact. As such, Defendants' motion for summary judgment will be denied with respect to Price's claim against Hainsworth of hostile work environment.

The same, however, cannot be said about Price's hostile work environment claim against Wingard. Wingard is not alleged to have made any discriminatory remarks himself. And Price's theory—that Wingard was deliberately indifferent to Hainsworth's harassment, *see Cardenas*, 269 F.3d at 268-69 (denying defendant's motion for summary judgment on a claim of hostile work environment where a dispute of material fact existed as to whether plaintiff's supervisor "was involved in, or deliberately indifferent to . . . the allegedly discriminatory actions")—is undercut by Price's own testimony. Price testified that he complained to Wingard about Hainsworth's behavior on multiple occasions. ECF No. 43-1, at 14-15, 18. While Price's complaints did not necessarily lead to any change in Hainsworth's behavior,

her subsequent retaliations against Price evidenced the fact that Wingard *did* speak to her about the issue: within days of each of his complaints to Wingard, Hainsworth allegedly punished Price by yelling at him in his office. *Id.* at 14-15, 18. Price endorsed this interpretation of events in his deposition. *Id.* at 18. Further, Wingard's moderating effect on Hainsworth was corroborated by Bowers, who stated that Hainsworth used racially charged language to refer to Price "much more regular[ly] when she was the superintendent" and Wingard was working in another office. ECF No. 43-12, at 9.

The testimony from both Price and Bowers, demonstrating that Wingard did confront Hainsworth and that it had some moderating effect, alongside the several depositions of Defendants and their witnesses, removes the question of whether Wingard was deliberately indifferent to Hainsworth's harassment from the purview of the jury. *Cf. Cardenas*, 269 F.3d at 268-69 (finding that plaintiff had shown a dispute of material fact for his claim of hostile work environment where defendant supervisor was not only aware of and failed to prevent discriminatory comments, but also failed to recommend plaintiff for reclassification, approved of disparate performance reviews, and disproportionately assigned minorities and trainees to plaintiff's unit due to plaintiff's minority status). Price's claim of a hostile work environment against Wingard does not survive the motion for summary judgment and will be dismissed.

**b. Constructive Discharge**

I turn next to Price's claims of constructive discharge. Constructive discharge is evaluated under an "objective standard" that asks "whether a reasonable person under the circumstances 'would have felt compelled to resign.'" *Peifer v. Bd. of Prob. & Parole*, 106 F.4th 270, 277 (3d Cir. 2024) (quoting *Judge v. Shikellamy Sch. Dist.*, 905 F.3d 122, 125 (3d Cir. 2018)). A plaintiff may establish constructive discharge either through 1) a sufficiently hostile work environment, or 2) other supervisory conduct.[8] *Boandl v. Geithner*, 752 F. Supp. 2d 540, 573 (E.D. Pa. 2010) ("A plaintiff can prove constructive discharge independent of a hostile work environment based on the actions of a supervisor.").

While Price's filings are not clear as to which type of constructive discharge he is alleging, I understand Price to be asserting both types of constructive discharge claims against both defendants.[9] ECF No. 1 (citing harassment, failure to stop

---

[8] Third Circuit caselaw does not make clear the interaction between these two types of constructive discharge. In particular, I am unable to determine whether evidence supporting each type of constructive discharge must be looked at in isolation (i.e., might evidence of a hostile work environment suffice when combined with evidence of supervisory conduct, even where neither set of evidence would be sufficient in isolation?). Because this case presents sufficient testimony to support a standalone claim of supervisory discharge, I need not address this question here.

[9] Plaintiff's constructive discharge claim is unique insofar as it is solely against two individual defendants whose actions, in combination, constitute constructive discharge—this claim is typically accompanied by a claim against plaintiff's employer. Such a claim, however, is not improper. *See Swicker v. William Armstrong & Sons, Inc.*, 484 F. Supp. 762 (E.D. Pa. 1980) (upholding joint liability

harassment, and threats of termination as grounds for Plaintiff's constructive discharge claims).

### 1. Hostile-Environment Constructive Discharge

I begin with Price's claims of hostile-environment constructive discharge. In the past, the Third Circuit Court of Appeals has endorsed a finding of constructive discharge based upon a "continuous pattern of discriminatory treatment over a period of years." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (rejecting a requirement for "aggravating circumstances" in constructive discharge claims, stating that "[t]he fact that [plaintiff] had been subject to continuous discrimination during her employment could support a conclusion that she simply had had enough"). Under this reasoning, surviving summary judgment on a hostile work environment claim would practically entail survival of a connected constructive discharge claim. *See Cardenas*, 269 F.3d at 266-67 ("We have found

---

for claim under Section 1981); *Embrico v. U.S. Steel Corp.*, 404 F. Supp. 2d 802, 821-22 (E.D. Pa. 2005) (holding that one plaintiff had made a *prima facie* case of constructive discharge against their employer based on the actions of multiple supervisors), *aff'd,* 245 F. App'x 184 (3d Cir. 2007); *see also Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505 (3d Cir. 1986) ("Although Section 1981 is a federal civil rights remedy it is in the nature of a tort remedy."), *aff'd,* 481 U.S. 604 (1987); *cf. Burton v. Pa. Bd. of Prob. & Parole*, No. 02-2573, 2002 WL 1332808, at *4, 7 (E.D. Pa. June 13, 2002) (allowing constructive discharge claim under Section 1981 against an individual defendant while dismissing the same claim against a second individual defendant because he was not alleged to be "responsible for a single affirmative act").

that [plaintiff] presented sufficient evidence to create a question of fact on the existence of a hostile work environment. It follows that he presented enough to survive summary judgment on the constructive discharge issue, . . . .").

The Supreme Court clarified this issue in *Pennsylvania State Police v. Suders*, in which the Court explained that constructive discharge based on a hostile work environment "entails something more" than does a standalone claim of hostile work environment. 542 U.S. 129, 147 (2004); *see also Neely v. McDonald's Corp.*, 340 F. App'x 83, 86 (3d Cir. 2009) (recognizing that a compound hostile-environment constructive discharge claim entails more than a showing sufficient for a claim of hostile work environment). Courts in this district have applied this heightened standard. *See, e.g., LaPorte v. Unity Fam. Servs. Inc.*, No. 2:22-cv-01226, 2023 WL 4100403, at *7 (W.D. Pa. June 21, 2023) (describing the "lower" burden of establishing a hostile work environment as compared to the burden of establishing constructive discharge based on that same work environment).

While Price has successfully established, for purposes of summary judgment, a dispute of fact as to his hostile work environment claim, the record does not support a work environment so hostile as to constitute constructive discharge. Indeed, the fact that Price remained at SCI-Somerset until he was allegedly threatened by Wingard—an act distinct from the evidence supporting Price's hostile work environment claim—precludes a reasonable inference that the hostile work

environment was "so intolerable" as to drive a reasonable person to resign. *See Neely*, 340 F. App'x at 85 (denying a hostile-environment constructive discharge claim where plaintiff's allegations undermined causal connection between hostile environment and resignation).

## 2. Supervisory Constructive Discharge

A constructive discharge claim need not be predicated on an underlying hostile work environment claim. Constructive discharge may also arise where a plaintiff's supervisors "so degraded his professional life that a trier of fact could conclude that he was constructively discharged." *Boandl*, 752 F. Supp. 2d at 574; *see also Stremple v. Nicholson*, 289 F. App'x 571, 573 (3d Cir. 2008) (declining to apply *Pennsylvania State Police v. Suders*'s heightened hostile-environment constructive discharge standard to supervisor-based constructive discharge claims).

Courts consider several factors in analyzing supervisor-based constructive discharge claims. *Boandl*, 752 F. Supp. 2d at 574. These factors are "whether the employer (1) threatened [the employee] with discharge or urged or suggested that [he] resign or retire; (2) demoted [him], (3) reduced [his] pay or benefits, (4) involuntarily transferred [him] to a less desirable position, (5) altered [his] job responsibilities, or (6) gave [him] unsatisfactory job evaluations." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010) (citation modified). Finally, "in most situations, a prerequisite to a successful constructive discharge claim is that the

plaintiff attempted to explore alternatives before electing to resign." *Stucke v. City of Philadelphia*, No. 12-6216, 2015 WL 2231849, at *5 (E.D. Pa. May 12, 2015), *aff'd*, 685 F. App'x 150 (3d Cir. 2017) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 975 (3d Cir. 1998)).

As an initial matter, Price testified that he explored alternatives prior to resignation. In particular, Price asked about transferring to a different position; however, the only option presented was SCI-Pine Grove, a facility nearly two hours away from Price and his family. ECF No. 43-1, at 33. When Price balked at the commute, he was told to "[j]ust try to hold on." [10] ECF No. 43-1, at 33. In addition, Hainsworth and Wingard subjected him to several of the above-listed factors.

Price testified that Hainsworth suggested that Price did not deserve his position and that he should resign. ECF No. 43-1, at 10, 12; *see also* ECF No. 43-11, at 5 (Unit manager Eric Frazier testifying that Hainsworth had "a disdain for him being there"). Hainsworth further altered Price's job conditions by instructing Price's subordinates to report to her and instructing Price not to notify certain subordinates

---

[10] At least one court in this circuit has found that transfer to a location entailing an unreasonable commute can itself, on summary judgment, support a constructive discharge claim. *See Gallagher v. Adamas Bldg. Servs*, No. 20-13926, 2022 WL 4115748, at *5 (D.N.J. Sept. 9, 2022) ("[T]he Court finds that arguably by transferring Plaintiff to a new building that was a significant distance from his original place of employment making commuting unreasonable, Defendants knowingly permitted conditions so intolerable that a reasonable person subject to them would resign.").

of their unsatisfactory work. ECF No. 43-1, at 10, 12, 22-23; *see also* ECF No. 43-12, at 6-7 (Bowers testifying that Hainsworth did not let price operate out of the command center during emergencies, despite such presence being the norm for staff of Price's rank); ECF No. 43-11, at 16 (Frazier testifying that Hainsworth singled out Price for disciplinary treatment). Price likewise testified that Wingard had threatened his career. ECF No. 43-1, at 31. Specifically, Wingard allegedly stated that Price would "not fare well" if Price spoke to anyone else regarding his suspicion of an impending attack. ECF No. 1, at 31; *see also* ECF No. 43-12, at 12 (testimony from Bowers stating that "it was commonly known in the institution that there was [sic] some volatile housing units").

Price's testimony regarding Wingard's purported threat—which, at this stage, we must credit—is particularly significant. In *Belton v. Allegheny General Hospital*, a court in this district found that, at the motion to dismiss stage, a plaintiff had sufficiently alleged constructive discharge where plaintiff's supervisor gave plaintiff the choice between resigning and facing disciplinary action. 703 F. Supp. 3d 685, 694 (W.D. Pa. 2023). This case presents a similar dilemma. Price considered himself between Scylla and Charybdis: remain silent about a reported threat or face the end of your career with the DOC. A determination of whether a reasonable person in Price's situation "would have felt compelled to resign" is a question that can only be

answered by a jury whose duty it is consider all the evidence before it and to resolve issues of witnesses' credibility.

Accordingly, the following order is entered:

## **ORDER OF COURT**

AND NOW, this 29th of January, 2026, for the foregoing reasons, it is hereby ORDERED that Defendants' motion for summary judgment, ECF No. 41, is DENIED IN PART and GRANTED IN PART. The motion is DENIED IN PART as to the following Counts:

- Count II against Defendant Hainsworth for hostile work environment under Section 1981; and

- Count VIII against both Defendants Hainsworth and Wingard for constructive discharge under Section 1981.

Defendants' motion for summary judgment is GRANTED as to all remaining Counts. Counts I-VII and IX are dismissed against Defendant Wingard with prejudice. Counts I, III-VII, and IX are dismissed against Defendant Hainsworth with prejudice.

/s/D. Brooks Smith

D. Brooks Smith
United States Circuit Judge
Sitting by Designation